1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11

SEAN POTTORFF,

No.  1:16-cv-01593-DAD-SKO

12

Plaintiff,

13

v.

ORDER DENYING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
AND DISMISSING CERTAIN CLAIMS AND
DEFENDANTS

14

CITY OF FRESNO, *et al.*,

15

Defendants.

(Doc. No. 28)

16

17

18

**INTRODUCTION**

19

        This matter is before the court on a motion for summary judgment filed by defendants,

20

which are the City of Fresno; Jerry Dyer, individually and in his official capacity as Chief of

21

Police for the City of Fresno; and Daniel Gonzalez, individually and in his official capacity as a

22

police officer for the City of Fresno (collectively, "defendants").  On November 19, 2019, the

23

motion came before the court for hearing.  Attorney Justin Dennis Harris appeared telephonically

24

on behalf of plaintiff, and attorney Bruce Daniel Praet appeared telephonically on behalf of

25

defendants.  For the reasons discussed below, the court will deny defendants' motion for

26

summary judgment and dismiss certain claims and defendants.

27

/////

28

/////

1

1

**BACKGROUND**

2

**A.      Factual Background**

3

The following facts are undisputed unless otherwise noted.  In September 2015, plaintiff

4

Sean Pottorff decided that he would commit suicide because of a series of personal setbacks.

5

(Doc. No. 34-2, Joint Statement of Undisputed Facts ("JUF") at 2.)  To prepare for his suicide

6

attempt, he obtained a .45 caliber handgun from a relative's home.  (*Id.*)

7

Before plaintiff could carry out his plan, a female acquaintance named Naomi called the

8

Fresno Police Department ("FPD") on September 18, 2015 and reported that plaintiff was suicidal

9

and holding her at gunpoint in his apartment.  (JUF at 2–3.)  When FPD officers arrived at the

10

scene, Naomi met them outside of plaintiff's apartment and informed them that she was not being

11

held against her will but confirmed that plaintiff was suicidal and in possession of a gun.  (Doc.

12

No. 28 at 8; JUF at 3.)  When the officers spoke with plaintiff, he denied that he was planning to

13

commit suicide and declined to exit his apartment.  (JUF at 4.)  A Fresno County mental health

14

worker was then called to the scene; after speaking with plaintiff—who again denied that he was

15

suicidal—the mental health worker determined that there was no basis to have plaintiff

16

involuntarily committed for psychiatric evaluation.  (Doc. No. 28 at 8; JUF at 4.)  Concluding that

17

there was insufficient evidence of a crime upon which to detain plaintiff, the officers departed.

18

(Doc. No. 28 at 8.)

19

The next day, on September 19, 2015, FPD learned that plaintiff was on active probation

20

for a domestic violence incident and was therefore barred from possessing a firearm.  (Doc. No.

21

28 at 8; JUF at 4.)  When FPD officers returned to plaintiff's apartment later that day to verify

22

that he was in compliance with the terms of his probation, they encountered his unidentified

23

female friend, who asked plaintiff to leave his apartment and help her with her vehicle.  (Doc. No.

24

28 at 8–9; JUF at 4–5.)  Plaintiff then left his apartment, taking his gun with him because he

25

suspected FPD might enter his apartment to seize it. (Doc. Nos. 28 at 9; 28-3 at 12:14–24.)

26

FPD officers then approached plaintiff, who responded by pointing his gun at his own

27

head and retreating to the front of his apartment.  (Doc. Nos. 32 at ¶¶ 7–8; JUF at 5.)  For at least

28

3 minutes and 40 seconds, FPD officers attempted to persuade plaintiff to put down the gun.  (*See*

2

Doc. No. 28-7, Body Camera Footage ("BCF") at 0:00–3:40; JUF at 5–6.)[1]  As evidenced by the body camera footage, the officers alternated between ordering plaintiff to put his gun down or pleading with him to do so, warning him that failure to do so could result in him being shot, and assuring him that they wanted only to help him and did not wish to harm him.  (*Id.*)  Nonetheless, plaintiff refused to comply and kept the gun pointed at his head.  (JUF at 6.)  The officers then deployed their tasers.  (JUF at 6–7.)  Officer Vilai Douangmala discharged his taser first.  (BCF at 3:40.)  Approximately five to six seconds later, Officer Brent Garcia discharged his taser.  (JUF at 7; BCF at 3:46.)

Whether the tasers had any effect upon plaintiff is disputed, and while the body camera footage contains a partial video recording of the encounter between plaintiff and the police, it provides only audio confirmation of the taser and firearm discharges.  (*See* BCF at 3:40–3:46.)  According to defendants, the first taser had "no immediate effect on [plaintiff,] who continued to hold the gun to his head," though defendants are unsure whether it was because the taser "missed or was simply ineffective."  (Doc. No. 28 at 10; JUF at 7.)  Defendants contend that the second taser also had "little to no disabling effect" on plaintiff, and that he subsequently lowered the gun in his right hand in the direction of the officers.  (Doc. No. 28 at 10; JUF at 7–9.)

Plaintiff's version of the events is murkier.  He contends that the tasers were fired "near simultaneously," just a "split second" apart, so "it is unclear if the first Taser had any effect," even though audio from the body camera indicates that the second taser was fired five to six seconds after the first.  (Doc. Nos. 28-3 at 17:21–25; 34-1 at 5:11–17; JUF at 7; BCF at 3:40–3:46.)  Plaintiff is nevertheless sure that the "second taser is what did the damage," causing a "harmful disabling effect."  (Doc. Nos. 28-3 at 17:8–9, 19–20; 34-1 at 5:11–17; JUF at 7.)  He is also certain that the second taser was what caused him to drop his gun and fall to the ground.  (Doc. Nos. 28-3 at 18:10–13; 32 at ¶ 8.)  However, plaintiff concedes that he does not know if his

---

[1]  The court has viewed the body camera footage in its entirety.  Unfortunately, due to the position of the officer whose body camera was filming during the 3 minutes and 47 seconds from the time that the officers approached plaintiff to the time defendant Gonzalez shot plaintiff, much of that footage is focused on a hedge, and plaintiff and most of the officers cannot be seen.  However, it is clear during that critical period of time that no one else is in the area in front of plaintiff's apartment other than himself and the officers.

1  right arm—the one that had been holding the gun—had moved in a downward motion towards the

2  police because he cannot "recall anything other than [the] pain" of being tasered.  (Doc. No. 28-3

3  at 18:14–19:6.)

4       Either way, the incident escalated from there.  According to Officer Gonzalez:

5       Upon being struck with the second Taser application, Mr. Pottorff
        appeared to try to fight the effects.  In doing so, he very clearly and
6       deliberately began to lower the handgun from his own head and point
        it directly toward myself and other officers.  Fearing that Mr. Pottorff
7       was going to shoot myself and other officers, I immediately fired 2–
        3 rounds from my handgun.
8

9  (Doc. No. 28-5 at ¶ 6.)  Body camera audio indicates that the shots were fired at plaintiff in quick

10  succession and approximately only one second after the second taser discharge.  (BCF at 3:47.)

11       Plaintiff nonetheless contends he was shot only after he had started to fall or was already

12  on the ground.  (Doc. No. 32 at ¶ 9.)  The shots fired by defendant Gonzalez struck plaintiff

13  twice, and plaintiff argues that "basic geometry" supports his assertion that Gonzalez shot him as

14  he was falling or already on the ground because one of the bullets allegedly struck him in the

15  face, exited his left cheek, and lodged in his left shoulder.  (*Id.*)  Plaintiff reasons that because his

16  face is higher than his left shoulder, "Officer Gonzalez had to be shooting in a downward

17  direction in order to have the bullet travel from my left cheek to my left shoulder."  (*Id.*)

18       Whether he collapsed before or after being shot by defendant Gonzalez, plaintiff

19  eventually ended up on the ground, at which point the officers secured plaintiff's gun, handcuffed

20  him, and began administering first aid.  (JUF at 9.)  Paramedics later arrived and took him away.

21  (*See* BWC at 10:18.)  As a result of the above incident, plaintiff was later convicted in Fresno

22  County Superior Court of violating California Penal Code §§ 417.8 and 29815(a) for exhibiting a

23  deadly weapon to the police in order to resist arrest or detention and for possessing a firearm

24  while subject to a probation restriction.  (Doc. No. 28-9 at 2–4.)

25  **B.   Procedural Background**

26       On October 21, 2016, plaintiff filed this civil rights action, alleging:  (1) use of excessive

27  force in violation of the Fourth Amendment, brought pursuant to 42 U.S.C. § 1983; (2) denial of

28  the right to counsel in violation of the Fifth Amendment, brought pursuant to 42 U.S.C. § 1983;

4

1    (3) a violation of the Bane Act, California Civil Code § 52.1; (4) battery; and (5) negligence.

2    (Doc. No. 1.)  Plaintiff also alleges a *Monell* claim against the City of Fresno.  (*Id.*)

3           Defendants moved for summary judgment on October 8, 2019, plaintiff filed his

4    opposition on November 5, 2019, and defendants filed their reply on November 7, 2019.  (Doc.

5    Nos. 28, 29, 34.)

6                                    **LEGAL STANDARD**

7           Summary judgment is appropriate when the moving party "shows that there is no genuine

8    dispute as to any material fact" and that it is "entitled to judgment as a matter of law."  Fed. R.

9    Civ. P. 56(a).  The moving party "initially bears the burden of proving the absence of a genuine

10   issue of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing

11   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  Where, as here, the non-moving party bears

12   the burden of proof at trial, "the moving party need only prove that there is an absence of

13   evidence to support the non-moving party's case."  *Oracle Corp.*, 627 F.3d at 387 (citing *Celotex*,

14   477 U.S. at 325).  If the moving party meets its initial burden, it shifts to the opposing party to

15   establish that a genuine dispute over a material fact actually exists.  *See Matsushita Elec. Indus.*

16   *Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

17          To meet their burden, the parties may not simply rest on their pleadings.  Rather, parties

18   must cite to specific parts of the record to show whether there is a genuine dispute over a material

19   fact.  *See* Fed. R. Civ. P. 56(c); *see also Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th

20   Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for

21   summary judgment.").  A fact is material if it might affect the outcome of the suit under

22   governing law, and the dispute, genuine if a reasonable jury could return a verdict for the non-

23   moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

24          Although the court takes undisputed facts as true and draws all inferences supported by

25   the evidence in favor of the non-moving party, *see Anthoine v. N. Cent. Counties Consortium*,

26   605 F.3d 740, 745 (9th Cir. 2010), the party opposing summary judgment "must do more than

27   simply show that there is some metaphysical doubt as to the material facts."  *Matsushita*, 475

28   U.S. at 587 (citation omitted).  However, the non-moving party need not establish a material issue

1   of fact conclusively in its favor.  It is enough that "sufficient evidence supporting the claimed

2   factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the

3   truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th

4   Cir. 1987) ("[A]t this [summary judgment] stage of the litigation, the judge does not weigh

5   conflicting evidence with respect to a disputed material fact.  Nor does the judge make credibility

6   determinations with respect to statements made in affidavits, answers to interrogatories,

7   admissions, or depositions.").  "Where the record taken as a whole could not lead a rational trier

8   of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475

9   U.S. at 587 (citation omitted).  Likewise, "a complete failure of proof concerning an essential

10  element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex*,

11  477 U.S. at 322.

12      Finally, where there is video evidence of the incident giving rise to an excessive use of

13  force claim, a court must "view[] the facts in the light depicted by the videotape." *Scott v. Harris*,

14  550 U.S. 372, 380–81 (2007 ) (explaining that courts should not rely on "such visible fiction" that

15  "is so utterly discredited by the record"); *Vos v. City of Newport Beach*, 892 F.3d 1024, 1028 (9th

16  Cir. 2018) ("The record is viewed in light most favorable to the nonmovants . . . , so long as their

17  version of the facts is not blatantly contradicted by the video evidence." (citations omitted)).

18  Nonetheless, even where video evidence exists, the circumstances may be such that reasonable

19  factfinders could draw divergent conclusions from what the video evidence shows.  *See S.R.*

20  *Nehad v. Browder*, 929 F.3d 1125, 1132–39 (9th Cir. 2019) (disputed issues of material fact

21  precluded summary judgment in an action alleging excessive use of force even though the

22  evidence included surveillance footage); *Glenn v. Washington County*, 673 F.3d 864, 878 (9th

23  Cir. 2011) ("The circumstances of this case can be viewed in various ways, and a jury should

24  have the opportunity to assess the reasonableness of the force used after hearing all the

25  evidence.").

26  /////

27  /////

28  /////

1

**DISCUSSION**

2

**A.      Voluntary Dismissal of Claims**

3

Before addressing defendants' pending motion for summary judgement as to plaintiff's

4

excessive use of force claim, there are preliminary issues to address.  First, plaintiff has agreed to

5

voluntarily dismiss his *Monell* claims because "he presently lacks sufficient evidence" to

6

prosecute them.  (Doc. No. 29 at 5.)  Second, plaintiff has also agreed to voluntarily dismiss his

7

second cause of action for "Denial of Right to Counsel."  (Doc. No. 28 at 1.)  Therefore,

8

plaintiff's *Monell* claims and his second cause of action for "Denial of Right to Counsel" will be

9

dismissed without prejudice, and defendants the City of Fresno and Jerry Dyer against whom

10

those claims were brought will also be dismissed as defendants from this action.

11

**B.      Use of Excessive Force Claim**

12

Title 42 U.S.C. § 1983 provides a cause of action for the deprivation of "rights, privileges,

13

or immunities secured by the Constitution or laws of the United States" by a person acting "under

14

color of any statute, ordinance, regulation, custom, or usage." *Gomez v. Toledo*, 446 U.S. 635,

15

639 (1980).  To prevail under § 1983, a plaintiff must prove "(1) that a right secured by the

16

Constitution or laws of the United States was violated, and (2) that the alleged violation was

17

committed by a person acting under the color of State law." *Long v. Cty. of Los Angeles*, 442

18

F.3d 1178, 1185 (9th Cir. 2006).  Plaintiff alleges that Officer Gonzalez employed excessive

19

force against him on September 19, 2015, in violation of the Fourth Amendment.[2]  There is no

20

dispute that Officer Gonzalez was acting under color of state law at the time in question.

21

A claim that a law enforcement officer used excessive force during an arrest is analyzed

22

under the Fourth Amendment's objective reasonableness standard.  *See Graham v. Connor*, 490

23

U.S. 386, 395 (1989).  Under the standard, "the question is whether the officers' actions are

24

'objectively reasonable' in light of the facts and circumstances confronting them, without regard

25

---

26

[2]  Plaintiff also alleged a claim for excessive use of force in violation of the Fourteenth
Amendment.  However, "*all* claims that law enforcement officers have used excessive force—

27

deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen
should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v.*

28

*Connor*, 490 U.S. 386, 388, 395 (1989).  Plaintiff's Fourteenth Amendment claim is therefore not
cognizable as a matter of law and will be dismissed.

1  to their underlying intent or motivation." *Id.* at 397.  Fundamental to "*Graham*'s objective-

2  reasonableness test is the clear principle that the force used to make an arrest must be balanced

3  against the need for force:  it is the need for force which is at the heart of the *Graham* factors."

4  *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1025 (9th Cir. 2015) (citing *Blankenhorn v. City*

5  *of Orange*, 485 F.3d 463, 480 (9th Cir. 2007)); *see also Liston v. County of Riverside*, 120 F.3d

6  965, 976 (9th Cir. 1997) (quoting *Alexander v. City & County of San Francisco*, 29 F.3d 1355,

7  1367 (9th Cir. 1994)).  Thus, in any such case, the court must balance "the nature of the harm and

8  quality of the intrusion on the individual's Fourth Amendment interests against the countervailing

9  governmental interests at stake." *Bryan v. MacPherson*, 630 F.3d 805, 823 (9th Cir. 2010)

10  (quoting *Graham*, 490 U.S. at 396); *see also Scott v. Harris*, 550 U.S. 372, 383–84 (2007); *Santos*

11  *v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002) ("Force is excessive when it is greater than is

12  reasonable under the circumstances.").

13       This test "calls for a fact-intensive inquiry requiring attention to all circumstances

14  pertinent to the need for the force used." *Velazquez*, 793 F.3d at 1024.  In conducting this inquiry

15  it must be kept in mind that,

16       [a]lthough it is undoubtedly true that police officers are often forced
to make split-second judgments, and that therefore not every push or

17  shove, even if it may seem unnecessary in the peace of a judge's
chambers[,] is a violation of the Fourth Amendment, it is equally true

18  that even where some force is justified, the amount actually used may
be excessive.

19

20  *Santos,* 287 F.3d at 853 (internal quotation marks and citations omitted).  This "inherently fact

21  specific" inquiry "should only be taken from the jury in rare cases." *Green v. City & Cty. of San*

22  *Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014) (citation omitted); *see also Avina v. United*

23  *States*, 681 F.3d 1127, 1130 (9th Cir. 2012) ("Because the excessive force inquiry nearly always

24  requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the

25  Ninth Circuit has] held on many occasions that summary judgment or judgment as a matter of law

26  in excessive force cases should be granted sparingly.").

27  /////

28  /////

1.     The Nature of the Harm and the Quality of the Intrusion

The court begins by assessing both the type and amount of force used.  *See Bryan*, 630

F.3d at 824; *Davis v. City of Las Vegas*, 478 F.3d 1048, 1055 (9th Cir. 2007).  Here, it is

undisputed that Officer Gonzalez shot plaintiff.  (JUF at 8.)  Shooting an individual with a firearm

constitutes use of deadly force.  *See, e.g.*, *Blanford v. Sacramento County*, 406 F.3d 1110, 1117–

19 (9th Cir. 2005).  And it is well-established that

> [t]he intrusiveness of a seizure by means of deadly force is
> unmatched.  The use of deadly force implicates the highest level of
> Fourth Amendment interests both because the suspect has a
> fundamental interest in his own life and because such force frustrates
> the interest of the individual, and of society, in judicial determination
> of guilt and punishment.

*A.K.H. by & through Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016) (internal

quotation marks and citations omitted).  Thus, "[d]eadly force is permissible only 'if the suspect

threatens the officer with a weapon or there is probable cause to believe that he has committed a

crime involving the infliction or threatened infliction of serious physical harm.'"  *Id.* (quoting

*Tennessee v. Garner*, 471 U.S. 1, 11 (1985)).

2.     The Governmental Interests at Stake

The use of deadly force must be balanced against the purported need for it.  *See Isayeva v.*

*Sacramento Sheriff's Dep't*, 872 F.3d 938, 946–47 (9th Cir. 2017); *see also Glenn*, 673 F.3d at

871; *Bryan*, 630 F.3d at 823.  Factors relevant to this balancing test include:  (1) the severity of

the alleged crime, (2) whether the suspect posed an immediate threat to the safety of the officers

or others, (3) whether the suspect actively resisted arrest or attempted to evade arrest by flight,

and (4) any other exigent circumstances.  *Isayeva*, 872 F.3d at 946–47; *see also Estate of Diaz v.*

*City of Anaheim*, 840 F.3d 592, 605 (9th Cir. 2016); *Mattos v. Agarano*, 661 F.3d 433, 441 (9th

Cir. 2011) (*en banc*); *Glenn*, 673 F.3d at 872.  Additional factors include "the availability of less

intrusive alternatives to the force employed, whether proper warnings were given[,] and whether

it should have been apparent to officers that the person they used force against was emotionally

disturbed."  *Isayeva*, 872 F.3d at 947 (quoting *Glenn*, 673 F.3d at 872).  Ultimately, the court

must "examine the totality of the circumstances and consider 'whatever specific factors may be

1  appropriate in a particular case, whether or not listed in *Graham*.'"  *Bryan*, 630 F.3d at 826

2  (quoting *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994)); *see also Mattos*, 661 F.3d at

3  441.

4          a.    *Immediate Threat to Safety*

5      "The 'most important' factor is whether the individual posed an 'immediate threat to the

6  safety of the officers or others.'"  *Glenn*, 673 F.3d at 872 (quoting *Bryan*, 630 F.3d at 826); *see*

7  *also A.K.H.*, 837 F.3d at 1011.[3]  Here, there is no dispute that when FPD officers arrived at

8  plaintiff's apartment on September 19, 2015 to determine whether he had a firearm in violation of

9  the terms of his probation, plaintiff refused to cooperate and instead pointed a gun at his own

10  head.  (Doc. No. 34-2 at 4.)

11      The parties' version of the events diverge from thereon.  According to plaintiff, he

12  "repeatedly told officers [he] wanted to be left alone."  (Doc. No. 32 at ¶ 8.)  But after several

13  minutes of a standoff, two officers tased him, causing him to drop his gun, which he asserts was

14  unloaded, not cocked, and visibly inoperable given the way he was holding it.  (*Id.* at ¶¶ 7–8.)

15  Plaintiff was then nevertheless shot by defendant Gonzalez.  (*Id.* at ¶¶ 8–9.)  Defendant Gonzalez,

16  however, urges the court to disregard plaintiff's version of events, arguing that plaintiff's

17  opposition to summary judgment is predicated entirely on a sham affidavit.  (Doc. No. 34 at 1–4.)

18  Instead, defendant Gonzalez contends that the only tenable version of events is the one where he

19  fired his gun *after* plaintiff moved his right arm—with gun in hand—downward and in the

20  direction of the officers, a version of events corroborated by three other eyewitness officers.

21  (Doc. Nos. 28-4 at ¶ 5; 28-5 at ¶ 6; 28-6 at ¶ 4; 28-8 at ¶ 5–6.)  In considering these divergent

22  views of the evidence, the court must assess whether plaintiff is relying on a sham affidavit.

23          i.    Whether Plaintiff's Declaration is a Sham Affidavit

24      "The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an

25  affidavit contradicting his prior deposition testimony."  *Van Asdale v. Int'l Game Tech.*, 577 F.3d

26

27     [3]  Relatedly, it has been recognized that "[a] desire to resolve quickly a potentially dangerous

28  situation is not the type of governmental interest that, standing alone, justifies the use of force that
may cause serious injury."  *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001).

989, 998 (9th Cir. 2009) (quoting *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991)).  Such "sham affidavits" can be disregarded by the district court.  *See Adler v. Fed. Republic of Nigeria*, 107 F.3d 720, 728 (9th Cir. 1997).  However, the "sham affidavit rule" must be applied with caution.  *Van Asdale*, 577 F.3d at 998.  The Ninth Circuit has thus imposed two important limitations on the rule:

> First, we have made clear that the rule does not automatically dispose of every case in which a contradictory affidavit is introduced to explain portions of earlier deposition testimony; rather, the district court must make a factual determination that the contradiction was actually a "sham."  Second, our cases have emphasized that the inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit.  Thus, the non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition [and] minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit.

*Id.* at 998–99 (internal quotation marks and citations omitted).

The court now turns to the affidavit in question here.  (*See* Doc. No. 32.)  According to defendant, there are five purported contradictions that establish that plaintiff's affidavit is a sham.  (Doc. No. 34 at 2–4.)  Though there appears to be some discrepancies between plaintiff's deposition testimony and his declaration opposing summary judgment, the court is not persuaded that these discrepancies rise to the level where plaintiff's declaration can be deemed a sham.

The first alleged contradiction concerns plaintiff's declaration that Officer Gonzalez threatened him when they first encountered each other on September 18, 2015.  (Doc. Nos. 32 at ¶ 5; 34 at 2.)  But defendant fails to point out any conflicting deposition testimony, relying instead on other evidence that defendant contends shows him attempting to help plaintiff.  (*See* Doc. No. 34 at 2.)  This evidence, which is extrinsic to plaintiff's deposition testimony, cannot be used to demonstrate that plaintiff's declaration is a sham.  *See Van Asdale*, 577 F.3d at 998–99 (applying the sham affidavit rule only where there is a contradiction between an affidavit and earlier deposition testimony).  And even if it could, the court sees no factual contradiction between plaintiff's affidavit and the evidence presented by defendant.  Whether defendant Gonzalez helped plaintiff by calling him a mental health professional or disarming him and

11

1   thereby preventing his suicide does not preclude the possibility that Gonzalez also threatened

2   plaintiff.

3        The second dispute is over plaintiff's statement in his declaration that his gun was

4   unloaded, not cocked, and visibly inoperable given the way it was being held.  (Doc. No. 32 at ¶

5   7.)  Defendant argues that this aspect of the declaration contradicts plaintiff's admission at his

6   deposition that the gun was cocked and loaded.  (Doc. No. 34 at 2.)  But this admission actually

7   consists of a reference made by defense counsel to an unspecified, prior interview conducted with

8   plaintiff, wherein plaintiff allegedly confirmed that his gun had been cocked and loaded and was

9   ready to be fired.  (Doc. No. 34-1 at 3:9–3:11.)  When confronted by this alleged prior statement

10  at his deposition, plaintiff demurred; he instead testified that he could not recall the statement

11  referenced by defense counsel, but that *if* he said it, then he was being "as truthful as [he] possibly

12  could."  (*Id.* at 3:21–22.)  The court concludes that such equivocation does not clearly and

13  unambiguously contradict plaintiff's declaration, especially because the alleged prior statement is

14  not properly before the court on summary judgment.  (Doc. No. 34-1 at 3:5–3:24.)  *See Van*

15  *Asdale*, 577 F.3d at 999 ("[T]he non-moving party is not precluded from elaborating upon,

16  explaining or clarifying prior testimony elicited by opposing counsel on deposition[, and] minor

17  inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence

18  afford no basis for excluding an opposition affidavit.") (quoting *Messick v. Horizon Indus.*, 62

19  F.3d 1227, 1231 (9th Cir. 1995)).

20       Third, defendant alleges that plaintiff falsely claimed in his affidavit that he "never made a

21  statement to officers that [he] wanted to go back into [his] apartment to take [his] own life.  (Doc.

22  No. 32 at ¶ 7; 34 at 2–3.)  Specifically, defendant points to an excerpt from plaintiff's deposition

23  testimony where plaintiff admitted that he wanted to go back into his apartment to commit

24  suicide.  (Doc. No. 34-1 at 4:18–4:24.)  But whether plaintiff wanted to commit suicide—and

25  whether he evinced that intention in his deposition testimony or by his actions during the actual

26  incident on September 19, 2015—is distinct from whether he verbally confessed that desire to the

27  police.  Again, the court sees no inconsistency here.

28  /////

12

1       The fourth purported inconsistency is over plaintiff's declaration that he did not point his

2   gun at the police.  (Doc. No. 32 at ¶ 8; 34 at 2–3.)  According to defendant, plaintiff admitted in

3   his deposition testimony that he could not recall if his right arm had come down in the direction

4   of the police.  (Doc. No. 34-1 at 7:14–7:23.)  Again, the court perceives no clear inconsistency.

5   Plaintiff's declaration that he did not point his gun at the officers—because he remembers

6   dropping the gun and hearing it hit the ground—does not necessarily bear on whether he

7   remembers if his right arm moved downwards towards the police.  (Doc. No. 32 at ¶ 8.)

8       The fifth and final alleged contradiction is over plaintiff's statement in his declaration that

9   he was shot by defendant Gonzalez while he was already either falling to or on the ground.  (Doc.

10  No. 34 at 3–4.)  According to defendant, plaintiff admitted during his deposition that he was not

11  knocked down by the taser, and that, as a result, he thought he would get tackled by the police.

12  (*Id.*)  But as with a point addressed above, this purported admission actually consists of

13  statements allegedly made by plaintiff in an unspecified, prior interview he gave that is not

14  properly before the court on summary judgment.  (Doc. No. 34-1 at 5:22–6:25.)  In his deposition

15  testimony, plaintiff repeatedly rejected defense counsel's characterizations of those statements

16  and reaffirmed that the second taser blast was what brought him to the ground, which is where

17  plaintiff believes he was when defendant Gonzalez shot him.  (*Id.*)

18      After reviewing the purported contradictions highlighted by defendant, the court can

19  identify no clear and unambiguous inconsistency between plaintiff's deposition testimony and his

20  declaration submitted in opposition to summary judgment.  Accordingly, the court finds that

21  plaintiff's affidavit cannot be deemed a sham.

22            ii.      A Genuine Dispute Over a Material Fact

23      With plaintiff's affidavit properly before the court on summary judgment, the court can

24  only conclude that plaintiff has established a genuine dispute over a material fact in this case.

25  Defendant Gonzalez and three other police officers assert in their sworn declarations that, even

26  after being hit by the second taser blast, plaintiff remained standing and holding a gun.  (Doc.

27  Nos. 28-4 at ¶ 5; 28-5 at ¶ 6; 28-6 at ¶ 4; 28-8 at ¶ 5–6.)  When plaintiff lowered his gun in the

28  direction of the officers, defendant Gonzalez fired at plaintiff, striking him twice.  (*Id.*)  Audio

1  from body camera footage indicates that defendant Gonzalez fired his gun at plaintiff

2  approximately one second after the second taser blast had been discharged.  (*See* BCF at 3:47.)

3  Plaintiff disputes the officers' characterization of what happened.  He attests in his own sworn

4  declaration—consistent with the testimony he gave at his deposition—that he dropped his gun,

5  heard it hit the ground, and started to fall to the ground after he was hit by the second taser.  (Doc.

6  Nos. 32 at ¶¶ 8–9; 34-1 at 5:15–5:17, 6:10, 6:18–25.)  Defendant nevertheless shot him.  (*Id.*)

7  Plaintiff also argues that the trajectory of one of the bullets, which struck him in the face, exited

8  his left cheek, and lodged itself in his left shoulder, shows that defendant Gonzalez must have

9  been shooting in a downward direction—in other words, as plaintiff was already falling to or on

10  the ground.  (Doc No. 32 at ¶ 9.)

11      Pointing a gun at police officers justifies the use of deadly force.  *See, e.g.*, *Hayes v.*

12  *County of San Diego*, 736 F.3d 1223, 1234 (9th Cir. 2013) ("[T]hreatening an officer with a

13  weapon does justify the use of deadly force."); *George v. Morris*, 736 F.3d 829, 838 (9th Cir.

14  2013) (same); *Smith v. City of Hemet*, 394 F.3d 689, 704 (9th Cir. 2005) (en banc) (same).

15  However, the fact that a suspect is armed with a deadly weapon does not render the use of deadly

16  force *per se* reasonable under the Fourth Amendment.  *See George*, 736 F.3d at 838; *Glenn*, 673

17  F.3d at 872–73; *see also Harris v. Roderick*, 126 F.3d 1189, 1204 (9th Cir. 1997) ("Law

18  enforcement officials may not kill suspects who do not pose an immediate threat to their safety or

19  to the safety of others simply because they are armed."); *Curnow v. Ridgecrest Police*, 952 F.2d

20  321, 323, 325 (9th Cir. 1991) (holding that deadly force was unreasonable where, according to the

21  plaintiff's version of facts, the decedent possessed a gun but was not pointing it at the officers and

22  was not facing the officers when they shot him).  Moreover, it is certainly unreasonable for a

23  police officer to "seize an unarmed, nondangerous suspect by shooting him dead."  *Garner*, 471

24  U.S. at 11; *see also Torres v. City of Madera*, 648 F.3d 1119, 1128 (9th Cir. 2011) (same).

25      Construing the evidence before the court on summary judgment in the light most

26  favorable to the nonmoving party, as the court must, the court concludes that a reasonable jury

27  could find that plaintiff had been visibly incapacitated by a taser, had dropped his gun, and was

28  falling to or already on the ground at the time he was shot by defendant Gonzalez.  This alone

1  could allow a reasonable jury to find that defendant Gonzalez's use of deadly force against

2  plaintiff was excessive and objectively unreasonable.  *See, e.g.*, *Estate of Lopez by & through*

3  *Lopez v. Gelhaus*, 871 F.3d 998, 1011 (9th Cir. 2017) (holding that a police officer's use of

4  deadly force against a suspect is not objectively reasonable if the suspect did not pose an

5  immediate threat to the safety of the officers); *see also Ventura v. Rutledge*, 398 F. Supp. 3d 682,

6  694 (E.D. Cal. 2019) (same).

7              b.      Other Relevant Factors

8              Although the disputed issue of material fact noted above is reason enough to deny the

9  pending motion for summary judgment, the court will turn briefly to the other relevant factors of

10  the objective reasonableness test for the sake of thoroughness.  First, defendant Gonzalez alludes

11  to the severity of the crime the officers confronted when they arrived at plaintiff's apartment on

12  September 19, 2015.  (Doc. No. 28 at 14.)  As noted above, the day prior to this incident, FPD

13  officers, including defendant Gonzalez, had responded to a report that a woman was being held at

14  gunpoint at plaintiff's apartment.  Though the woman later disavowed that she was being held

15  against her will, the officers learned the next day that plaintiff was forbidden from having any

16  firearms by the terms of his probation stemming from a prior domestic violence incident.

17  Defendant argues that the police thus had "legitimate concerns that Plaintiff was in fact in

18  possession of a handgun in violation of his probation and presenting an ongoing danger to himself

19  [and others]."  (Doc. No. 28 at 14.)  Possession of a firearm in violation of probation under

20  § 29815(a) of the California Penal Code, however, is a misdemeanor offense.  If the test for the

21  severity of a crime were to turn strictly on whether it is categorized as a felony or a misdemeanor,

22  then misdemeanors—even ones involving the possession of a deadly weapon—"provide little, if

23  any, basis for [the] use of deadly force."  *See S.R. Nehad v. Browder*, 929 F.3d 1125, 1136 (9th

24  Cir. 2019).  However, a probationer in illegal possession of a *firearm*—as opposed to merely a

25  knife as was the case in *S.R. Nehad*—can nonetheless pose a significant threat to police officers,

26  regardless of the fact that such an offense is categorized as a misdemeanor.  *See, e.g.*, *Lowry v.*

27  *City of San Diego*, 858 F.3d 1248, 1257 (9th Cir. 2017) (noting that burglary, which can be

28  prosecuted either as a felony or a misdemeanor, "is dangerous because it can end in confrontation

15

1   leading to violence").  A reasonable jury could decide that either factor applies here.

2          Second, defendant Gonzalez argues that plaintiff chose to ignore the officers' repeated

3   orders to put his gun down and instead "refused to comply and insisted that he be allowed to go

4   inside his apartment to commit suicide on his own terms."  (Doc. No. 28 at 14.)  The

5   undersigned's review of the body camera footage indicates that the officers repeatedly alternated

6   between ordering plaintiff to put down his gun and pleading with him to do so, and they warned

7   him that his failure to comply could result in their use of deadly force.  (BCF at 0:30–3:38.)

8   Consideration of these factors, along with plaintiff's decision not to comply with the officers'

9   directions, could weigh in favor of a conclusion that defendant's decision to shoot plaintiff was

10  reasonable.  *Cf. S.R. Nehad*, 929 F.3d at 1137–38; *see also Marquez v. City of Phoenix*, 693 F.3d

11  1167, 1175 (9th Cir. 2012), *as amended on denial of reh'g* (Oct. 4, 2012) ("[I]f the officer warned

12  the offender that he would employ force, but the suspect refused to comply, the government has

13  an increased interest in the use of force.").

14         Nonetheless, here, the officers also knew that plaintiff was suicidal and, at least according

15  to plaintiff, any implied threats of violence on his part were clearly directed at himself rather than

16  the officers or others.  Consideration of such evidence could weigh against a conclusion that

17  plaintiff posed an immediate threat to the safety of the officers.  *See Glenn*, 673 F.3d at 873; *see*

18  *also Marquez*, 693 F.3d at 1175 ("[I]f the police were summoned to the scene to protect a

19  mentally ill offender from himself, the government has less interest in using force.").  *But see*

20  *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1092 (9th Cir. 2013) ("Suicidal individuals can

21  quickly turn homicidal and may engage police officers in an effort to commit 'suicide by cop.'").

22         Finally, defendant argues that the officers first tried to employ tasers before resorting to

23  deadly force.  (Doc. No. 28 at 14–15.)  "Officers 'need not avail themselves of the least intrusive

24  means of responding to an exigent situation; they need only act within that range of conduct . . .

25  identif[ied] as reasonable.'"  *Glenn*, 673 F.3d at 876 (quoting *Scott v. Henrich*, 39 F.3d 912, 915

26  (9th Cir. 1994)).  "However, police are required to consider what other tactics[,] if any[,] were

27  available, and[,] if there were clear, reasonable and less intrusive alternatives to the force

28  employed, that militates against finding the use of force reasonable."  *Id.* at 876 (citing *Bryan*,

16

630 F.3d at 831).  Because the officers first used less intrusive methods such as "persuasion" and tasers, a jury could weigh these factors in favor of defendant Gonzalez.  *Id.* at 876, 879.  But a jury could also conclude that resorting to use of a firearm a mere second after the last use of a taser was an unwarranted case of an officer escalating too quickly to the use of deadly force.  *Id.* at 879.

Either way, consideration of these other factors and the evidence linked to them is not dispositive.  Even if they indisputably favored defendant, a reasonable jury could still conclude, based upon the evidence before the court on summary judgment, that plaintiff was visibly unarmed and incapacitated at the time of he was shot, and that defendant's use of deadly force was therefore objectively unreasonable under the circumstances.  *See, e.g.*, *Ventura*, 398 F. Supp. 3d at 694.  Summary judgment is therefore precluded.

### 3.   Qualified Immunity

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Mullenix v. Luna*, __ U.S. __, __,136 S. Ct. 305, 308 (2015) (internal quotation marks omitted).  When a court is presented with a qualified immunity defense,[4] it must determine whether:  (1) the facts alleged, taken in the light most favorable to the plaintiff, demonstrate that the defendant's conduct violated a statutory or constitutional right; and (2) the right at issue was "clearly established."  *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *accord Pearson v. Callahan*, 555 U.S. 223, 236–42 (2009) (holding that courts need not analyze the two prongs of the analysis announced in *Saucier* in any particular order).  The Supreme Court has repeatedly "stressed the importance of resolving immunity questions at the earliest possible stage in litigation."  *Pearson*, 555 U.S. at 232.

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, 'the contours of a right are sufficiently clear' that 'every reasonable official

---

[4]  "Qualified immunity is an affirmative defense that the government has the burden of pleading and proving."  *Frudden v. Pilling*, 877 F.3d 821, 831 (9th Cir. 2017) (citing *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992)).

would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creigton*, 483 U.S. 635, 640 (1987)).  While a case directly on point is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix*, 136 S. Ct. at 308 (quoting *al-Kidd*, 563 U.S. at 741); *see also A.K.H.*, 837 F.3d at 1013.  "The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Id.* at 308 (quoting *al-Kidd*, 563 U.S. at 742); *see also Clement v. Gomez*, 298 F.3d 898, 906 (9th Cir. 2002) ("The proper inquiry focuses on . . . whether the state of the law [at the relevant time] gave 'fair warning' to the officials that their conduct was unconstitutional.").  This inquiry "must be undertaken in light of the specific context of the particular case, not as a broad general proposition." *Mullenix*, 136 S. Ct. at 308 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)).

"[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that 'it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *Mullenix*, 136 S. Ct. at 308 (quoting *Saucier*, 533 U.S. at 205).  "Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela v. Hughes*, __U.S.__, __, 138 S. Ct. 1148, 1153 (2018) (quoting *Mullenix*, 136 S. Ct. at 309).

But "[t]he determination of whether a reasonable officer could have believed his conduct was lawful is a determination of law that can be decided on summary judgment only if the material facts are undisputed.  If, however, there is a material dispute as to the facts regarding what the officer or the plaintiff actually did, the case must proceed to trial . . . ." *LaLonde v. Cty. of Riverside*, 204 F.3d 947, 953 (9th Cir. 2000) (citation omitted); *see also Estate of Lopez*, 871 F.3d at 1021 ("[S]ummary judgment in favor of moving defendants is inappropriate where a genuine issue of material fact prevents a determination of qualified immunity until after trial on the merits.") (quoting *Liston v. Cty. of Riverside*, 120 F.3d 965, 975 (9th Cir. 1997)); *Wilkins v. City of Oakland*, 350 F.3d 949, 956 (9th Cir. 2003) ("Where the officers' entitlement to qualified

18

1   immunity depends on the resolution of disputed issues of fact in their favor, and against the non-

2   moving party, summary judgment is not appropriate."); *Santos*, 287 F.3d at 855 n.12 ("[W]hether

3   the officers may be said to have made a 'reasonable mistake' of fact or law, may depend upon the

4   jury's resolution of disputed facts and the inferences it draws therefrom."); *Martinez v. Stanford*,

5   323 F.3d 1178, 1184-85 (9th Cir. 2003) (disputed issues of fact essential to the qualified

6   immunity defense precluded summary judgment).

7       As noted above, in this case, the parties dispute whether plaintiff posed an immediate

8   threat to the officers at the time he was shot by defendant Gonzalez.  Unfortunately, the video

9   evidence is incomplete and does not resolve the dispute.  Based on the evidence before the court

10   on summary judgment, a reasonable jury could conclude that defendant Gonzalez fired at plaintiff

11   only after plaintiff pointed a gun in the direction of the officers.  Under such circumstances,

12   defendant would have been exercising reasonable force, and so no constitutional right would have

13   been violated.  Qualified immunity therefore need not be reached or applied.  *See, e.g.*, *Hayes*,

14   736 F.3d at 1234; *Smith*, 394 F.3d at 704; *George*, 736 F.3d at 838.

15       But a reasonable jury could also conclude from the evidence that plaintiff had been visibly

16   disarmed and incapacitated by a taser blast and was falling to or already on the ground when

17   defendant Gonzalez shot him.  In such a situation, where a suspect has been disarmed and is

18   perceptibly no longer dangerous, it has been clearly established that police officers may not use

19   deadly force.  *See, e.g.*, *Torres*, 648 F.3d at 1128 (holding that qualified immunity does not apply

20   when an officer uses deadly force against a "suspect . . . already arrested, handcuffed, and in the

21   back seat of a patrol car").  For that reason, defendant's invocation of the decisions in *Wilkinson*

22   *v. Torres*, 610 F.3d 546 (9th Cir. 2010) and *George v. Morris*, 736 F.3d 829 (9th Cir. 2013) is

23   unavailing.  (Doc. Nos. 28 at 19; 34 at 7.)  In *Wilkinson*, the Ninth Circuit held that "'the Fourth

24   Amendment does not require omniscience,' and absolute certainty of harm need not precede an

25   act of self-protection."  610 F.3d at 553.  But in that case, which involved a high-speed car chase,

26   the court determined that there was "no evidence" that the defendant officer had perceived the

27   suspect decelerating his vehicle.  *Id.* at 553.  Here, however, all the officers have attested that

28   plaintiff was in their direct line of sight.  (*See* Doc. Nos. 28-4; 28-5; 28-6; 28-8.)  If plaintiff's

1  evidence that he was disarmed and incapacitated at the time he was shot is believed by the trier of

2  fact, defendant Gonzalez would have violated plaintiff's clearly established rights by shooting

3  him even though he posed no threat to the officers.  It is true that the "Fourth Amendment [does

4  not] always require[] officers to delay their fire until a suspect turns his weapon on them."

5  *George*, 736 F.3d at 838–39.  However, the court cannot say that defendant "assuredly stayed

6  within constitutional bounds without knowing" for sure whether plaintiff was armed or visibly

7  disarmed and incapacitated at the time he was shot by defendant.  *George*, 736 F.3d at 838–39.

8  The existence of disputed issues of material fact here precludes the application of qualified

9  immunity on summary judgment.

10      In turn, defendant argues that "even the existence of material issues of fact will not

11  preclude the application of qualified immunity if the law was not 'clearly established' at the

12  time." (Doc. Nos. 28 at 17; 34 at 6–7.)  But, as discussed above, the law has long been clearly

13  established in this regard—if the jury were to believe plaintiff's evidence, the use of deadly force

14  was unconstitutionally excessive.

15      It is true that the Supreme Court has repeatedly emphasized "the longstanding principle

16  that 'clearly established law' should not be defined 'at a high level of generality.' . . . [C]learly

17  established law must be 'particularized' to the facts of the case."  *White v. Pauly*, 137 S. Ct. 548,

18  552 (2017) (citations omitted).  But expanding the scope of the court's review beyond the

19  "moment" deadly force was used does not change the court's analysis here.  For example, it is

20  clearly established that even when previous applications of force may have been justified—such

21  as the two deployments of the tasers here—the reasonableness of force must also be assessed "at

22  the moment" any subsequent force is used.  *Graham*, 490 U.S. at 396; *Glenn*, 673 F.3d at 874;

23  *Blankenhorn*, 485 F.3d at 481; *see also Jones v. Las Vegas Metro. Police Dep't*, 873 F.3d 1123,

24  1132 (9th Cir. 2017) (holding that it is clearly established that the police may not continue to use

25  deadly force on "a prone suspect who exhibits no resistance, carries no weapon, is surrounded by

26  sufficient officers to restrain him and is not suspected of a violent crime").  Moreover, where

27  possible, officers should evaluate, even in rapidly evolving situations, whether prior tasing(s)

28  were sufficient before resorting to any additional force.  *See Jones v. Treubig*, 963 F.3d 214, 236–

20

37 (2d Cir. 2020) (collecting cases); *see also Mattos v. Agarano*, 661 F.3d 433, 445 (9th Cir. 2011) ("Three tasings in such rapid succession provided no time for [the plaintiff] to recover from the extreme pain she experienced, gather herself, and reconsider her refusal to comply.").

In addition, the Ninth Circuit has cautioned that even conventional law enforcement tactics may be inappropriate when employed against emotionally disturbed individuals:

> The problems posed by, and thus the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense. In the former instance, increasing the use of force may, in some circumstances at least, exacerbate the situation; in the latter, a heightened use of less-than-lethal force will usually be helpful in bringing a dangerous situation to a swift end. In the case of mentally unbalanced persons, the use of officers and others trained in the art of counseling is ordinarily advisable, where feasible, and may provide the best means of ending a crisis. Even when an emotionally disturbed individual is "acting out" and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual.

*Deorle v. Rutherford*, 272 F.3d 1272, 1282–83 (9th Cir. 2001) (citation omitted).[5]

/////

/////

/////

/////

/////

---

[5] Like plaintiff here, the plaintiff in *Deorle* was armed for at least a part of the incident in question; though he did not have a gun, Deorle was holding, at various points during the encounter with police, a wooden board, a hatchet, a plastic crossbow, and possibly a container of lighter fluid. *Deorle*, 272 F.3d at 1276–77. Like plaintiff, Deorle did not attempt to flee or otherwise leave the area; instead he "continued to roam on or about the property but well within the police roadblocks." *Id.* at 1276. Finally, the police contained the incident for at least 30 to 40 minutes before an officer fired a cloth-cased projectile at Deorle, a length of time substantially longer than the approximately four minutes that the officers here spent communicating with plaintiff in this case. *Id.* However, unlike the instant case, Deorle discarded each of his weapons when he was ordered to by the police, which included members of a Special Incident Response Team that specialized in arresting suspects "in the most efficient and least hazardous manner . . . with a minimum amount of risk or danger" to the suspect. *Id.* at 1278.

1    Other circuits have come to similar conclusions as the Ninth Circuit under comparable

2  fact patterns.[6]  For example, in a recent case, police officers shot a man armed with a knife who

3  had been tased four times, hit in the brachial plexus, kicked, and placed in a chokehold.  *Estate of*

4  *Jones v. City of Martinsburg*, 961 F.3d 661, 663–64 (4th Cir. 2020).  There, the Fourth Circuit

5  held that a reasonable jury could conclude that the suspect, though armed with a knife, had been

6  secured and incapacitated immediately before the police saw his knife, drew back, and fired at

7  him 22 times.  *Id.* at 665.  The court concluded that the officers were therefore not entitled to

8  qualified immunity because, as early as 2011, it had been clearly established that "officers may

9  not shoot a secured or incapacitated person."  *Id.* at 668–69 (collecting cases); *see also*

10  *Brockington v. Boykins*, 637 F.3d 503, 504, 507 (4th Cir. 2011) (holding that "a reasonable officer

11  would have recognized that deadly force was no longer needed after [the suspect] was injured and

12  helpless with his back on the ground," even though "the initial use of deadly force to subdue him

13  was reasonable").  Similarly, the Tenth Circuit recently held that police officers were not entitled

14  to qualified immunity if they advanced towards an emotionally disturbed individual armed with a

15  baseball bat, escalating the encounter until they shot him dead.  *Estate of Ceballos v. Husk*, 919

16  F.3d 1204, 1209–11, 1215 (10th Cir. 2019) (relying on cases decided as early as 1997); *see also*

17  *Allen v. Muskogee*, 119 F.3d 837, 839–40, 842–45 (10th Cir. 1997) (rejecting qualified immunity

18  in a case where police left cover and approached a suicidal armed person to try and take away a

19  gun, resulting in the police shooting and killing the armed individual).

20  /////

21

22  ---

[6]  The Ninth Circuit has held:

23  
24              Absent binding precedent, we look to all available decisional law,
              including the law of other circuits and district courts, to determine
              whether the right was clearly established. We also evaluate the
25              likelihood that this circuit or the Supreme Court would have reached
              the same result.  While officers cannot be expected to predict the
26              future course of constitutional law, the law may be clearly
              established even if there is no case directly on point.  It is enough if
              in the light of pre-existing law the unlawfulness is apparent.

27

28  *Inouye v. Kemna*, 504 F.3d 705, 714–15 (9th Cir. 2007) (internal quotation marks and citations
omitted).

22

It is true that "a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat" if a suspect is "armed—or reasonably suspected of being armed." *George*, 736 F.3d at 838.  The court "is clear-eyed about the potentially volatile and dangerous situation" that confronted defendant Gonzalez, *id.*, and that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments." *Graham*, 490 U.S. at 396.  But the court cannot, on summary judgment, base entry of judgment on accepting as true the officers' testimony that plaintiff lowered his gun in their direction when plaintiff has presented evidence to the contrary.  *See Orn v. City of Tacoma*, 949 F.3d 1167, 1181 (9th Cir. 2020) (citations omitted).  As the Ninth Circuit recently observed under similar circumstances:

> In the end, this is not a case in which the legality of the officer's conduct falls within the "hazy border between excessive and acceptable force."  When the facts are viewed in the light most favorable to [plaintiff, the non-moving party], as they must be at this point in the litigation, [the defendant] had "fair and clear warning of what the Constitution requires."  What [the defendant] most forcefully contests is whether his alternative account of the shooting should be accepted as true.  Factual disputes of that order must be resolved by a jury, not by a court adjudicating a motion for summary judgment.

*Id.*  Again, therefore, the court cannot apply qualified immunity at this stage of this case given the disputed nature of the evidence.

## C.     Whether Plaintiff's Criminal Convictions Bar His Civil Claims under *Heck* and its State Law Analogue

As a result of the incident on September 19, 2015, plaintiff was apparently convicted under California Penal Code §§ 417.8 and 29815(a) for exhibiting a deadly weapon to a police officer to resist arrest or detention and possession of a firearm with a probation restriction.  (*See* Doc. No. 28-9.)  Defendant argues that these convictions preclude plaintiff's § 1983 claim for excessive force under the Supreme Court's decision in *Heck v. Humphrey*, 512 U.S. 477 (1994), and plaintiff's state law claims under *Yount v. City of Sacramento*, 43 Cal. 4th 885, 902 (2008),

/////

/////

23

1   California's state-law equivalent to *Heck*.[7]  The court is unpersuaded by this argument.

2       In *Heck*, the Supreme Court held that

3       in order to recover damages for allegedly unconstitutional conviction
        or imprisonment, or for other harm caused by actions whose
4       unlawfulness would render a conviction or sentence invalid, a § 1983
        plaintiff must prove that the conviction or sentence has been reversed
5       on direct appeal, expunged by executive order, declared invalid by a
        state tribunal authorized to make such determination, or called into
6       question by a federal court's issuance of a writ of habeas corpus.  A
        claim for damages bearing that relationship to a conviction or
7       sentence that has not been so invalidated is not cognizable under §
        1983.  Thus, when a [plaintiff] seeks damages in a § 1983 suit, the
8       district court must consider whether a judgment in favor of the
        plaintiff would necessarily imply the invalidity of his conviction or
9       sentence; if it would, the complaint must be dismissed . . . .

10  512 U.S. at 486–87.  But a "conviction based on conduct that occurred before the officers

11  commence the process of arresting the defendant is not 'necessarily' rendered invalid by the

12  officers' subsequent use of excessive force in making the arrest."  *Smith*, 394 F.3d at 696.  Even if

13  events underlying a criminal conviction occurred "in one continuous chain of events, two isolated

14  factual contexts [c]ould exist, the first giving rise to criminal liability on the part of the criminal

15  defendant, and the second giving rise to civil liability on the part of the arresting officer."  *Hooper

16  v. Cty. of San Diego*, 629 F.3d 1127, 1132 (9th Cir. 2011) (quoting *Yount*, 443 Cal. at 889).

17      This temporal logic applies here.  There is no dispute that plaintiff was convicted for

18  possessing a firearm while subject to a probation restriction and for exhibiting a deadly weapon to

19  a police officer to resist arrest.  (Doc. No. 28-9.)  *See Yount*, 43 Cal. 4th at 900, 902 ("To the

20  extent [the plaintiff] does not deny that he resisted the officers (or that the officers had the right to

21  respond with reasonable force), he poses no challenge to his conviction, and to that extent," his

22  § 1983 and state law claims are not barred under *Heck* or *Yount*).  *If* the factfinder had determined

23  as a part of those convictions that plaintiff possessed and/or exhibited a deadly weapon to a police

24  officer to resist arrest at the moment defendant Gonzalez shot plaintiff, then the success of

25  plaintiff's claims *would* necessarily imply the invalidity of his criminal convictions.

26  /////

27  _____

28  [7]  The analysis under *Heck* and *Yount* are the same.  *See Fetters v. Cty. of Los Angeles*, 243 Cal.
    App. 4th 825, 834–35, 843–44 (2016).

1      But where the defendant relies on *Heck*, he has the burden of proving that the plaintiff's

2  success on his claims will necessarily imply the invalidity of plaintiff's criminal conviction.   *See*

3  *Smith*, 394 F.3d at 698; *Sanford v. Motts*, 258 F.3d 1117, 1119 (9th Cir. 2001).  The evidence

4  before this court on summary judgment provides no indication as to the factual bases upon which

5  plaintiff was criminally convicted in state court.  It is therefore entirely possible that plaintiff

6  was convicted solely on the basis of his actions taken *before* he was shot by defendant Gonzalez, and

7  that plaintiff could have been disarmed and incapacitated by the time Gonzalez employed deadly

8  force against him.  The events on September 19, 2015 could thus have yielded two factual

9  predicates:  the first supporting plaintiff's criminal convictions under §§ 417.8 and 29815(a), and

10  the second giving rise to civil liability on the part of defendant for his use of excessive force.  *See*

11  *Hooper*, 629 F.3d at 1132.  Thus, defendant has failed to satisfy his burden to show that plaintiff's

12  claims are *Heck*-barred.  *See Smith*, 394 F.3d at 698 ("Because we are unable to determine 'the

13  factual basis for [the plaintiff's] plea,' his lawsuit does *not* necessarily imply the invalidity of his

14  conviction and is therefore not barred by *Heck*."); *cf. Beets v. Cty. of Los Angeles*, 669 F.3d 1038,

15  1045 (9th Cir. 2012) (holding that the *Heck* bar applies when "the record shows that the jury . . .

16  determined that [the police] . . . did not use excessive force," and "plaintiffs seek to show that the

17  very same act constituted excessive force").

18      Based upon the evidence currently before the court, or the lack thereof, the court

19  concludes that defendant is not entitled to summary judgment on the basis of *Heck* or *Yount*.

## CONCLUSION

21  For the reasons discussed above:

22      1.      Defendant's motion for summary judgment (Doc. No. 28) is denied;

23      2.      Plaintiff's *Monell* and Denial of Right to Counsel claims are dismissed without

24              prejudice;

25      3.      Plaintiff's Fourteenth Amendment claim is dismissed *sua sponte* due to plaintiff's

26              failure to state a cognizable claim; and

27  /////

28  /////

4.      Defendants the City of Fresno and Jerry Dyer, individually and in his official capacity as Chief of Police for the City of Fresno, are dismissed from this action without prejudice; and

5.      The matter is referred back to the assigned magistrate judge to re-schedule dates for a Settlement Conference, Final Pretrial Conference and Jury Trial.[8]

IT IS SO ORDERED.

Dated:   __**August 2, 2020**__               _____
                                                                      UNITED STATES DISTRICT JUDGE

---

[8] Law and motion in this case is now closed.  (Doc. No. 17.)  The previously scheduled dates for Settlement Conference, Pretrial Conference and Jury Trial were vacated pending the court's disposition of the motion for summary judgment.  (Doc. No. 37.)  Those dates may now be reset by the assigned magistrate judge based upon the input of the remaining parties.  While a new jury trial date may now be set, the parties are reminded of two impediments in that regard.  First, the courthouses of the Eastern District of California remain closed to the public and jury trials are not currently being conducted in the in light of the ongoing COVID-19 pandemic and its spread through those counties within this district.  *See* General Order 617.  Second, even if the court were to reopen to the public at some point and jury trials to resume, absent the filling of current vacancies on this court the likelihood is that any civil jury trial date set before the undersigned will be vacated prior to the trial of the case due to the ongoing judicial emergency caused by the current lack of adequate judicial resources.  (Doc. No. 38 – Standing Order.)